## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**CAROLYN NOLEN, WINDY KELLEY, CARA KELLEY and PAULA LITTON,**

   **Plaintiffs,**

**v.**          **Case No: 6:20-cv-330-PGB-EJK**

**FAIRSHARE VACATION OWNERS ASSOCIATION,**

   **Defendant.**

_____/

### ORDER

   This cause comes before the Court on Defendant's Motion for Summary Judgment (Doc. 94 (the "**Motion**")) and the parties' respective responses and replies thereto (Docs. 105, 109). Upon consideration, the Motion is due to be granted.

## I.  BACKGROUND

### A.  Factual Background: The Trust and Related Parties[1]

   This class action dispute flows from the alleged self-interested mismanagement of a timeshare trust by its trustee. The timeshare trust, the Fairshare Vacation Plan Use Management Trust (the "**Trust**"), was settled by Wyndham Vacation Resorts, Inc. ("**WVR**"), a developer of resort communities and

---

[1] The following facts come from the parties' Stipulation of Agreed Material Facts (Doc. 103) or are not reasonably in dispute.

vacation plans which WVR sells as timeshare interests ("**Use Rights**"). (Doc. 103,
¶ 1).  The Trust forms the foundation of the Club Wyndham Plus Program (the
"**Program**"), a timeshare program that allows Use Right owners to exchange their
"home resort" Use Rights with other owners in the Program. (Doc. 45, ¶ 10). When
a consumer purchases a property interest, they can assign their Use Rights to the
Trust; only through this assignment can an owner participate in the Program.
(Doc. 45, ¶ 10). Indeed, WVR established the Trust for the express purpose of
"permit[ting] the Beneficiaries to use and exchange the Use Rights available
through the Trust." (Doc. 103, ¶ 2). The Program effectively expands a timeshare
owner's vacation options and allows owners to stay at various Wyndham-
connected resorts, not just their "home resort."

Fairshare    Vacation    Owners    Association    ("**Defendant-Trustee
Fairshare**") is a nonprofit corporation that serves as Trustee of the Trust. (*Id.* ¶
4). Defendant-Trustee Fairshare does not compensate itself for acting as the
Trustee, does not have employees, and does not compensate the individuals who
sit on its board of directors. (*Id.* ¶¶ 35–36, 47). Defendant-Trustee Fairshare does
not possess any ownership share of WVR. (Doc. 94, ¶ 8). The Trust is governed by
the Second Amended and Restated Fairshare Vacation Plan Use Management
Trust Agreement (the "**Trust Agreement**"), which became effective on March 14,
2008. (Doc. 103, ¶ 3). WVR sells and markets interests in its various property
portfolios, without participation from Defendant-Trustee Fairshare; purchasers of
these interests, such as Plaintiffs, become Beneficiaries of the Trust after assigning

the Use Rights in their purchased ownership interests to the Trust. (*Id.* ¶¶ 32, 50). Other listed Beneficiaries of the Trust include Defendant-Trustee Fairshare, the Plan Manager, and WVR. (*Id.* ¶¶ 8–9).

Defendant-Trustee Fairshare could not fulfill its duties as Trustee without hiring a Plan Manager. (*Id.* ¶ 53). Currently, the Trust Agreement names WVR as the Plan Manager. (*Id.* ¶ 17). Specifically, the Trust Agreement states "[t]he initial Plan Manager shall be Wyndham, its successors or assigns . . . ." (*Id.* ¶ 14). At the same time, both the Trust Agreement and Defendant-Trustee Fairshare's bylaws provide a procedure to replace the Plan Manager. (*Id.* ¶ 31). Plaintiffs have never tried to replace WVR as Plan Manager. (*Id.* ¶ 33).

Moreover, Defendant-Trustee Fairshare's only agreement with any other Wyndham entity is a Management Agreement regarding WVR's role as the Plan Manager. (*Id.* ¶¶ 5–6). Section 6.03 of the Trust Agreement states that the "Management Agreement is incorporated [into the Trust Agreement] by reference and made a part [of the Trust Agreement] as though set forth word for word." (*Id.* ¶ 15). Section 6.02 of the Trust Agreement further states that the Trustee may "delegate any or all of its duties . . . to the Plan Manager." (Doc. 45-1). Section 9.02 of the Trust Agreement states that "[t]he Trustee . . . [is] relieved of any and all liability to any Beneficiary . . . from the Trustee . . . acting in accordance with the terms" of the Trust Agreement. (*Id.*). Pursuant to the Management Agreement, WVR in its role as Plan Manager has "all the powers and authority, and limitations thereon, which the Trustee has, pursuant to the Trust Agreement . . . ." (Doc. 103,

¶ 52). The Management Agreement entitles WVR to compensation of "five percent (5%) of the Program Fees,[] special and other assessments (other than the [Owners Association] Fees) collected from Members . . . ." (*Id.* ¶ 55). In addition, Defendant-Trustee Fairshare must reimburse WVR for "all costs and expenses (including without limitation, a reasonable profit at the prevailing market rate) arising from various identified matters encompassing the spectrum of management, operation, and maintenance of the [] timeshare program." (*Id.* ¶ 56). To that end, WVR has billed the Trust for expenses separate from the Management fee that it earns. (*Id.* ¶ 61). Relatedly, Defendant-Trustee Fairshare has acknowledged at times reimbursing other Wyndham subsidiaries used by WVR for services rendered to maintain the Program as part of its role as Program Manager. (*Id.* ¶ 57). Finally, WVR owns property interests that are subject to the Trust but can also use those for its own purposes. (*Id.* ¶ 51).

Defendant-Trustee Fairshare does not own an office and instead uses the offices of Wyndham Vacation Ownership, Inc. ("**WVO**"), a parent company of WVR. (Doc. 92-1, 29:12–20; Doc. 103, ¶ 48). Throughout the class period, all those individuals serving on Defendant-Trustee Fairshare's Board of Directors have also been employees of WVO, including board member Jodi Rogers. (Doc. 103, ¶ 49, 60). Jodi Rogers and her team create the Program budgets after reviewing input from WVR in its role as Program Manager. (*Id.* ¶ 60). These Program budgets directly influence the calculation of the Program Fees charged to Members, including Plaintiffs. (*See id.* ¶¶ 12, 54).

WVR sold Plaintiffs their respective "home-resort" ownership interests in a club or property. (*Id.* ¶ 18). For Plaintiffs Windy & Cara Kelley and Paula Litton, that "home-resort" ownership interest was in PTVO Owners Association, Inc. (*Id.*). For Carolyn Nolen, that "home-resort" ownership interest was in certain units at Fairfield Orlando at Bonnet Creek Resort. (*Id.*). Defendant-Trustee Fairshare had no say in the terms WVR offered to Plaintiffs when WVR sold them their timeshare property interests. (*Id.* ¶ 32). While conditional on participation in the Program, Plaintiff's purchase of these property interests and assignment of their Use Rights was otherwise voluntary. (Doc. 94, ¶ 32; Doc. 94-7, p. 2). Plaintiffs acknowledged that, first, they purchased an ownership interest in a club or property and that, second, they assigned the Use Rights in their ownership interests to the Trust. (Doc. 103, ¶ 28). During this process, Plaintiffs received copies of the Trust Agreement, the Management Agreement, and Defendant-Trustee Fairshare's Bylaws. (*Id.* ¶ 29). Plaintiffs further signed assignment agreements which disclosed WVR as Plan Manager of the Trust. (*Id.* ¶ 30). Section 14.07 of the Trust Agreement provides that Members are deemed to have agreed to be bound by the Trust Agreement and the Management Agreement by assigning their Use Rights to the Trust, paying [a] Program Fee, and otherwise using the benefits of the Trust. (*Id.* ¶ 16).

"Each Member [of the Trust] other than [WVR] is required to pay the Fairshare Plus Assessment," which "consists of the sum of the Program Fee and the Owners' Association Fee . . . ." (*Id.* ¶ 10). The Program Fee is the fee "payable

to the Trustee under Article X . . . by the Members for the expenses incurred in connection with the operation and administration of the [Program]," the amount of which "is determined by the Trustee" to cover the cost of the operation and administration of the Program. (*Id.* ¶¶ 12, 54). Ultimately, Defendant-Trustee Fairshare's Board of Directors must approve the Program Fee. (*Id.* ¶ 58). The Owners' Association ("**OA**") Fee is the "annual fee or fees due from each Member in respect of his Property Interest which fees shall be paid by the Member to, and held in escrow . . . by, the Trustee." (*Id.* ¶ 13). The OA Fee "shall be equal to the sum of all annual amounts . . . that each . . . Member agreed to pay the OA which governs the Property Interest which [the] Member used as the basis of his Membership," the amount of which is "determined by" the respective OAs, "not by the Trustee." (*Id.*). WVR "is not required to pay any OA Fees or Program Fees except as provided by Section 11.08" of the Trust Agreement. (*Id.*). Section 11.08 requires WVR to pay "occupancy related expenses" when WVR reserves a property subject to the Trust, and Plaintiffs put forward no evidence these payments were not made. (Doc. 45-1, ¶ 11.08).

Plaintiff Litton does not know what the OA or Program Fees are, how they are calculated, or whether she pays them and has never investigated why they have increased. (*Id.* ¶¶ 37–40). Nevertheless, she testified to her belief that the fees are excessive. (Doc. 105, p. 11). Plaintiff Nolen does not know what the Program Fee is, how much it is, how it compares to other timeshare programs, or how Defendant-Trustee Fairshare sets its annual budget. (Doc. 103, ¶¶ 42–43). Nevertheless, she

testified to her belief that "if there are profits, those profits could be used to reduce the prices, reduce the fees, reduce the expenses of" being a participant in the Program. (Doc. 105, pp. 10–11). Plaintiffs Cara and Windy Kelley do not know what the Program Fee is, how it is calculated, or how much it is; Plaintiff Windy Kelley has no information about whether any increase in timeshare fees was justified; and Plaintiff Cara Kelley does not know what the OA fee is and has never reviewed Defendant-Trustee Fairshare's financials. (Doc. 103, ¶¶ 44–46). Nevertheless, Plaintiff Cara Kelley testified to her belief that the fees are excessive. (Doc. 105, p. 11). Defendant-Trustee Fairshare's audited financial statements establish that it has previously accumulated a yearly Fund Balance and cash surplus. (Doc. 103, ¶ 59). Nevertheless, the annual Program Fee has not decreased in almost a decade despite this surplus Trust Fund balance. (Doc. 82-1, 132:23–133:13).

### B.    Procedural Background

Named Plaintiffs Carolyn Nolen, Windy Kelley, Cara Kelley, and Paula Litton bring suit on behalf of themselves, and all others similarly situated, alleging Defendant-Trustee Fairshare breached its fiduciary duties to Beneficiaries of the Trust. (Doc. 45). Initially, Plaintiffs proceeded against multiple distinct entities in the Wyndham family but dropped all defendants except Defendant-Trustee Fairshare in their operative First Amended Complaint. (Docs. 1, 45). In an Order partially granting Defendant's Motion to Dismiss, the Court dismissed Counts II–V of the First Amended Complaint, leaving only Counts I and VI in place. (Doc. 67). Plaintiffs then filed a Second Amended Complaint. (Doc. 69). However, the Court

struck the Second Amended Complaint because Plaintiffs impermissibly attempted to plead three new theories of the case. (Doc. 76).[2] Defendant now moves for summary judgment, and this matter is ripe for review.[3] (Docs. 94, 105, 109).

---

[2]    The Court allowed Plaintiffs to "file a second amended complaint consistent with the directives of [the Order Dismissing Counts II–V of the First Amended Complaint]." (Doc. 67). But the Second Amended Complaint was stricken by the Court as it "substantially exceed[ed] the authority to replead . . . granted by the Court." (Doc. 76, p. 1). Significantly, in its Order Striking the Second Amended Complaint the Court found Plaintiffs improperly attempted to "scrap their theory of the case and replace it with three unpled theories" in violation of the Court's previous directives. (Doc. 67, p. 12; Doc. 76, pp. 9–10). Specifically, instead of fixing the First Amended Complaint's factual deficiencies regarding their claims under the Arkansas Trust Code, Plaintiffs asserted for the first time that Defendant-Trustee Fairshare violated its fiduciary duties by: 1) failing to hold a vote on an end-of-year Trust fund balance as set out by Defendant-Trustee Fairshare's Bylaws; 2) impermissibly reimbursing WVR for expenses related to a marketing program designed to solicit new timeshare customers; and 3) failing to perform "any initial or ongoing analysis or due diligence regarding the selection of WVR as the Plan Manager, the amount of the Management Fee paid to WVR, WVR's continuing services and rates, the amounts being charged by WVR for expenses, nor whether other independent third-parties could provide the same or similar services at a lower cost." (Doc. 76, pp. 5–6) (quoting Doc. 69, pp. 28–32).

The Court further observed in its Order Striking the Second Amended Complaint:

> The Court appreciates that Count [I] (Declaratory Judgement) depends on Counts [II]–[V] which have been dismissed, and that Count [VI] (Breach of Fiduciary Duty) similarly relies on the dismissed Counts. While this may preclude Plaintiffs from successfully defending summary judgment, those two Counts are procedurally viable at [the pleading] juncture.

(*Id.* at p. 8 n.7).

[3]    The Court entered an order certifying the class on July 12, 2022, after Defendant filed the instant Summary Judgment Motion but before Defendant-Trustee Fairshare's response in opposition and Plaintiff's reply in support. (*See* Docs. 94, 95, 96, 105, 109).

In its class certification order, the Court refused to peer too searchingly into the merits of the case when deciding the narrower class certification issue, particularly when there was insufficient briefing regarding potential common law breach of fiduciary duty claims. (Doc. 95, pp. 5–6).

## II.    STANDARD OF REVIEW

To prevail on a summary judgment motion, the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case. An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014).

The Court must "view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party and resolve all reasonable doubts about the facts in favor of the non-movant." *Davila v. Gladden*, 777 F.3d 1198, 1203 (11th Cir. 2015) (quoting *Carter v. City of Melbourne*, 731 F.3d 1161, 1166 (11th Cir. 2013) (per curiam)). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1162 (11th Cir. 2006) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)). At bottom, summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.    DISCUSSION

This case turns on whether Defendant-Trustee Fairshare violated its fiduciary duties to the Plaintiffs as beneficiaries.[4] Whether a fiduciary duty exists is a question of law.[5] *City of Prescott v. Sw. Elec. Power Co.*, 438 F.Supp.3d 943,

---

[4]  The parties agree that the resolution of Count VI's breach of fiduciary duty claim determines the outcome of Count I's declaratory judgment claim. (*See* Doc. 94, p. 25; *see* Doc. 105, p. 20). In Count I, Plaintiff seeks a declaration that:

   a.  the Trust is governed by Arkansas law;

   b.  Plaintiffs are Beneficiaries of the Trust;

   c.  the Trustee owes a fiduciary duty to the Beneficiaries of the Trust;

   d.  the fiduciary duty owed to the Beneficiaries by the Trustee included not profiting from property in the Trust;

   e.  the fiduciary duty owed to the Beneficiaries by the Trustee included not setting up arrangements with related entities which allowed those related entities to profit from property in the Trust or from the Beneficiaries of the Trust;

   f.  the Trustee has violated its duties.

(Doc. 45, ¶ 43). First, the parties do not dispute subparagraphs (a)-(c), so they are not at issue here. (Doc. 94, p. 25; Doc. 105, p. 20). Second, the parties' briefing is of one accord: the resolution of Count VI decides whether Plaintiffs are entitled to a declaratory judgment as to subparagraphs (d)-(f).  (*See* Doc. 94, p. 25; *see* Doc. 105, p. 20).

[5]  Up until this point, the Court had not yet squarely decided which state law applied to this dispute.  (*See* Doc. 67, p. 9 n.7) ("Neither party provided the Court with the required elements of a breach of fiduciary duty, nor did they discuss which state law would apply. The Court discusses Plaintiffs' breach of fiduciary duty claims as if they arise under the laws of Arkansas."). In its Motion, Defendant briefed the choice of law issue and noted that there was a false conflict between Florida and Arkansas law because they were substantially similar under Florida's application of the "Most Significant Relationship" Test that applies to tort actions. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (holding that federal courts sitting in diversity apply the conflict-of-laws rules of the forum state); (Doc. 94, pp. 11, 12). Plaintiffs argue Arkansas law should apply under the Trust Agreement's express terms, which were agreed to by Plaintiffs when they assigned their Use Rights to the Trust. *See Razi v. Razavi*, No. 5:12-cv-80, 2012 WL 7801361, *1, *6 (M.D. Fla. Dec. 21, 2012) *report and recommendation adopted*, 2013 WL 1193005 (M.D. Fla. Mar. 22, 2013) (Florida federal court sitting in diversity applying a contract's choice of law provision to breach of fiduciary duty and other tort claims where claims were "inextricably and factually tied to the transactions which culminated in the parties' execution of the land sale contracts that contain the choice of law

953 (E.D. Ark. 2020) (citing *Long v. Lampton*, 922 S.W.2d 692, 698 (Ark. 1996)).

But whether a fiduciary duty was violated is a question of fact. *Johnson v. Walker*,

No. 4:14-cv-04078, 2015 WL 11121363, *1 (W.D. Ark. June 10, 2015) (citing *Wal-*

*Mart Stores, Inc. v. Coughlin*, 255 S.W.3d 424, 431 (Ark. 2007)).

> Breach of fiduciary duty involves betrayal of a trust and benefit by the dominant party at the expense of one under his influence . . . . [A] person standing in a fiduciary relationship may be held liable for any conduct that breaches a duty imposed by the fiduciary relationship. It follows that, regardless of the express terms of an agreement, a fiduciary may be held liable for conduct that does not meet the requisite standards of fair dealing, good faith, honesty, and loyalty. The guiding principle of the fiduciary relationship is that self-dealing, absent the consent of the other party to the relationship, is strictly proscribed. Self-dealing breaches the fiduciary duty even when the action taken is innocent and unintentional.

*Cole v. Laws*, 76 S.W. 3d 878, 883 (Ark. 2002) (internal quotations and citations

omitted).

In the trust context, "[s]elf-dealing by a trustee . . . is always suspect. It is a

universal rule of equity that a trustee shall not deal with trust property to his own

---

provision" and when "[p]laintiff . . . relie[d] upon the multiple agreements and the lengthy relationship as a basis for the duty that he claims was breached . . . .").

The Trust Agreement contains a choice of law provision. It provides: "[t]his Trust Agreement shall be deemed an Arkansas Trust and shall be governed by the laws of the State of Arkansas." (Doc. 45-1, p. 5). The Trust Agreement further provides that it "shall be construed in accordance with the laws of the State of Arkansas." (Doc. 45-1, pp. 16–17).

In part because Defendant concedes Arkansas and Florida law are substantially similar, the Court will follow the *Razi* Court and apply Arkansas law because the fiduciary duty tort claims arise from and are inextricably tied up with the Trust and the provisions agreed to in the Trust Agreement by Plaintiffs when they purchased their Use Rights and assigned them to the Trust. This approach also has the benefit of ensuring consistency across the Court's past rulings in this case which applied the Arkansas Trust Code and Arkansas common law to the dispute. (*See* Docs. 67, 96).

advantage without the knowledge or consent of the *cestui que* trust." *Alexander v. Alexander*, 561 S.W.2d 59, 67 (Ark. 1978). In 2005, Arkansas enacted the Arkansas Trust Code which provides that, "[t]he common law of trusts and principles of equity supplement this chapter, except to the extent modified by this chapter or another statute of this state." ARK. CODE ANN. § 28-73-106. After the passage of the Arkansas Trust Code, an Arkansas court harmonized the statutory self-dealing provision, Arkansas Trust Code § 28-73-802, and past Arkansas case law regarding trustee self-dealing:

> [Section 802(a) of the Arkansas Trust Code] provides that a trustee shall administer the trust solely in the interests of the beneficiaries. [Section 802(b)] provides that a sale, encumbrance, or other transaction involving the investment or management of trust property entered into by the trustee for the trustee's own personal account or which is otherwise affected by a conflict between the trustee's fiduciary and personal interests is voidable by a beneficiary affected by the transaction *unless, among other things, the transaction was authorized by the terms of the trust.*
>
> It is permissible for one of several trustees or a sole trustee also to be one of several beneficiaries of a trust, even though conflicts of interest and coincidental benefits to that trustee-beneficiary result. *Clement v. Larkey*, 863 S.W.2d 580, 582 (Ark. 1993). The fact of a coincidental benefit to a trustee is not alone sufficient to establish a breach of fiduciary duty on the part of the trustee. *Id.* The general rule is that a trustee, in administering a trust, is under the duty of acting exclusively and solely in the interest of the trust estate or the beneficiaries *within the terms of the trust* and is not to act in his own interest by taking part in any transaction concerning the trust where he has an interest adverse to that of the beneficiary. *Hosey v. Burgess*, 890 S.W.2d 262, 265 (Ark. 1995).

*Pulliam v. Murphy*, 485 S.W.3d 711, 715 (Ark. Ct. App. 2016) (emphasis added).

To determine the terms of the trust:

> [an Arkansas court] construing a trust applies the same rules applicable to the construction of a will, and the paramount principle in the interpretation of wills is that the intention of the testator, or trust settlor, governs. The settlor's intention is to be determined from viewing the four corners of the instrument considering the language used and giving meaning to all its provisions whenever possible. Further, the court should give force to each clause of the trust, and only when there is irreconcilable conflict between two clauses must one give way to the other. The court may read the language used by the settlor in light of the circumstances existing when the trust was written but only if there is uncertainty about the settlor's intentions from looking at the language used in the trust. When the purpose of a trust is ascertained, that purpose will take precedence over all other canons of construction.

*Fisher v. Boling*, 575 S.W.3d 592, 594 (Ark. Ct. App. 2019) (internal citations omitted).

Plaintiffs pursue four factual theories regarding how Defendant-Trustee Fairshare violated its fiduciary duties: 1) Defendant-Trustee Fairshare entered into a management agreement with an affiliated entity and allowed that entity to serve as Plan Manger; 2) Defendant-Trustee Fairshare exempted the Plan Manager from paying Program Fees; 3) Defendant-Trustee Fairshare maintained an excessive surplus in the Trust Fund which should have been passed on to Plaintiffs as Beneficiaries; and 4) Defendant-Trustee Fairshare charged excessive Program Fees.[6] In turn, the Court addresses why these theories cannot survive Defendant's Motion for Summary Judgment.

---

[6]  Plaintiff concedes that it does not have evidence to pursue its pled theory that Defendant-Trustee Fairshare impermissibly allowed an affiliated entity to finance, securitize, and service loans involving the Trust property. (Doc. 105, pp. 19–20).

### A.    Management Agreement

Plaintiffs claim that Defendant-Trustee Fairshare breached its fiduciary duties by entering into a management agreement with affiliated entity WVR and allowing it to serve as Plan Manager.[7] (Doc. 105, p. 22). While the evidence shows that WVO employees—rather than WVR executives—sit on the board of Defendant-Trustee Fairshare, Plaintiff has not put forward sufficient evidence that could demonstrate Defendant-Trustee Fairshare was controlled by an affiliated entity or that any entity received an improper benefit as a result of the Management Agreement.[8] (Doc. 103, ¶¶ 49, 60).

First, Plaintiffs argue that "a common law claim for breach of a fiduciary duty is not constrained by the terms of a written agreement or subject to the application of the Arkansas Trust Code." (Doc. 105, pp. 22). However, the Arkansas Trust Code and Arkansas common law work in concert together as a regulatory scheme. Arkansas Trust Code § 106 states that, "[t]he common law of trusts and principles of equity supplement this chapter, except to the extent modified by this chapter or another statute of this state." ARK. CODE ANN. § 28-73-106. Moreover, Arkansas case law confirms that the Arkansas Trust Code's duty of loyalty

---

[7]    Defendant-Trustee Fairshare argues it should not be considered an "affiliated entity" with WVR or WVO under Arkansas law, but the Court need not decide this issue because it finds that even if these entities were affiliated as defined under Arkansas law, Plaintiff's claims cannot survive the Motion. (Doc. 94, pp. 16–17).

[8]    The Court refuses to entertain evidence related to due diligence by Defendant-Trustee Fairshare because this was part of the theory of the case the Court instructed Plaintiffs to avoid in its Order Striking the Second Amended Complaint. (Doc. 76, pp. 5–6) (quoting Doc. 69, pp. 28–32).

provision, Section 802, and the common law of trusts work in tandem: a trustee may engage in transactions that would otherwise present impermissible conflicts of interest when they are "authorized by the terms of the trust." *See Pulliam*, 485 S.W.3d at 715 (citing ARK. CODE ANN. § 28-73-802(b)). This is the case even while "[s]elf-dealing by a trustee is always suspect, and it is a universal rule of equity that a trustee shall not deal with the trust property to its own advantage without the knowledge or consent of the *cestui que* trust." *Hosey*, 890 S.W.2d at 265. Undoubtedly, fiduciary obligations cannot be "extinguished by contract." *Cent. Flying Serv., Inc. v. StarNet Ins. Co.*, 150 F. Supp. 3d 1038, 1041 (E.D. Ark. 2015). But the principles governing trusts and those governing contracts are not the same. The paramount principle in the interpretation of trusts is that the intention of the trust settlor governs, and this intention "is to be determined from viewing the four corners of the instrument considering the language used and giving meaning to all its provisions whenever possible." *Fisher*, 575 S.W.3d at 594.

The Court will not ignore the clear and unequivocal intent of the settlor embodied in the terms set forth within the four corners of the Trust Agreement and the incorporated Management Plan, including the designation of WVR as Plan Manager and all the related rights and responsibilities that were described therein. (Doc. 103, ¶¶ 5–6, 14, 15, 17, 51–53, 55–57). Further, Plaintiffs concede that they signed assignment agreements which disclosed WVR as Plan Manager of the Trust; that they received copies of the Trust Agreement and the Management Agreement when purchasing their Use Rights; and that Section 14.07 provides that Members

are deemed to have agreed to be bound by the Trust Agreement and the Management Agreement by assigning their Use Rights to the Trust, paying [a] Program Fee, and otherwise using the benefits of the Trust. (*Id.* ¶¶ 16, 28–30). In other words, the simple fact that WVR is related in some way to Defendant-Trustee Fairshare does not make WVR serving in the role of Plan Manager suspect because this role was established by the terms of the Trust (and the incorporated Management Agreement), disclosed to Plaintiffs, and consented to by Plaintiffs when they assigned their Use Rights to the Trust.

Plaintiffs argue their signatures and assignment of Use Rights to the Trust do not amount to consent to Defendant-Trustee Fairshare's actions because a consent defense is "fact-intensive and not appropriate for resolution on summary judgment." (Doc. 105, p. 24). In support, Plaintiffs cite to a contracts case requiring consent be obtained without duress. *See Mechs. Lumber Co. v. Smith*, 752 S.W.2d 763, 765 (Ark. 1988). Even if this case applied to trusts, Plaintiffs have not asserted their consent was obtained under duress or put forward evidence in support of such an assertion. Plaintiffs also argue that even if they agreed to WVR serving as Plan Manager in general, they did not consent to Defendant-Trustee Fairshare and WVR's specific acts. (Doc. 105, pp. 24). This attempt to shift the scope of consent finds no support in Arkansas law.[9] In any event, even if Plaintiffs' consent is

---

[9] While not dispositive, the Court notes the relevance of Plaintiff's admission it has never attempted to pursue the method available under the Trust Agreement to remove WVR as Plan Manager. (Doc. 103, ¶¶ 31, 33). This fact only bolsters the Court's finding that Plaintiffs consented to Defendant-Trustee Fairshare and WVR's activities, particularly given the backdrop of Plaintiffs' paucity of affirmative evidence.

invalid, Plaintiffs cannot explain away that the terms of the Trust expressly provide for WVR's role as Plan Manager.

While the Court agrees with Plaintiffs that the Trust Agreement cannot be read to delegate or otherwise wholly extinguish Defendant-Trustee Fairshare's fiduciary duties, Arkansas law permits a settlor to narrow the scope of the duty of loyalty through the terms of the trusts to allow for the trustee to engage in transactions that might otherwise raise conflicts of interest. *See Pulliam*, 485 S.W.3d at 715. Here, the terms of the Trust allow Defendant-Trustee Fairshare to transact and work in coordination with WVR, despite the potential conflicts of interest present in these relationships. Nevertheless, if Plaintiffs could demonstrate that the terms of the Trust were violated, that these potential conflicts of interest ripened into improper benefits to Defendant-Trustee Fairshare or its related entities to the detriment of the Beneficiaries, or that Defendant-Trustee Fairshare's supervisory role as trustee was abdicated due to its interactions with WVR, the provision for WVR's role as Plan Manager in the terms of the Trust could not save Defendant-Trustee Fairshare. But Plaintiffs' proffered evidence fails to make out such showings.[10]

---

[10]    The Court finds further support for this view in *Hambrick v. Farmers & Merchs. Bank, Stuttgart*, No. CA97-867, 1998 WL 84101, *6 (Ark. App. 1998). There, an Arkansas appellate court held that while it might have been possible under some circumstances for a trustee's actions to have constituted impermissible self-dealing, the facts bore out a lower court's finding that no breach of fiduciary duty occurred. *Id.* This was especially true when there was no indication that the beneficiaries were unaware of the trustee's actions. *Id.* So too here. While it is certainly possible that Defendant-Trustee Fairshare's relationship with WVR could have constituted impermissible self-dealing, the record simply does not support such a conclusion, especially when the nature of WVR's role as Plan Manager was disclosed to Plaintiffs and Plaintiffs took no action to remove WVR from this role.

### B.    Exemption From Paying Program Fees

Plaintiffs further assert that WVR's exemption from paying Program Fees is a breach of Defendant-Trustee Fairshare's fiduciary duties because this results in higher Program Fees for Plaintiffs than necessary. (Doc. 105, p. 24). This exemption, however, is provided for in the Trust Agreement. (Doc. 103, ¶ 13). As detailed *supra*, the terms of the Trust insulate Defendant-Trustee Fairshare from a finding it breached its duties due to the exemption alone. *Pulliam*, 485 S.W.3d at 715. Absent something more, the Court will not assume that the exemption by itself constitutes an improper benefit. Without some affirmative evidence to demonstrate this exemption is specifically tied to higher Program Fees for Plaintiffs, Plaintiffs fail to make a showing that it violates the duties Defendant-Trustee Fairshare owed to Plaintiffs or that it caused them harm. (*See* Doc. 105, p. 19).  At bottom, Plaintiffs' reliance on speculation alone is not enough to create a triable issue of fact. (*See id.*).

### C.    Surplus Trust Balance

Plaintiffs also allege that Defendant-Trustee Fairshare violated its fiduciary duties by "failing to return any surplus" Trust balance to the beneficiaries. (Doc. 105, pp. 16–17). In doing so, Defendant supposedly "placed the financial interests of related parties such as WVR and 'other Wyndham subsidiaries' above the interests of the beneficiaries." (*Id.*). In support, Plaintiffs cite several raw end-of-year surplus Trust fund balances, especially the December 2020 Trust fund balance, as well as the fact that a vote to return the Trust's surplus funds has never

been held.[11] (*Id.* at p. 17). These facts are insufficient as a matter of law to support Plaintiffs' claim.

As an initial matter, the Court has already noted that, "'a positive fund balance' by itself does not amount to profit to Defendant[-Trustee Fairshare]." (Doc. 67, p. 8). And the allegation that Defendant-Trustee Fairshare retains this balance for its own use or the use of WVR and other Wyndham subsidiaries was "fact free." (*Id.*). This is true because citing to the raw Trust balance itself tells the Court nothing about whether Defendant-Trustee Fairshare has gone too far. *Cf. Jennen v. Sipe,* No. CA04-1342, 2005 WL 1463437, at *2–3 (Ark. Ct. App. June 22, 2005) (finding a plaintiff failed to introduce evidence demonstrating the standard of care in the relevant industry in affirming a trial court's directed verdict). The Court need not credit Defendant-Trustee Fairshare's assertion that it needs $7 to $8 million in cash to keep its payables current to find that its fiduciary duties did not require it to return funds to the Beneficiaries simply because the Trust had a surplus balance. (Doc. 94-1, 148:1–6). Without analysis showing when the retention of the Trust's surplus would become excessive or allegations supported by specific facts tending to show that Defendant-Trustee Fairshare used the Trust balance for its own or its related entities' benefit, the Court finds Plaintiffs have

---

[11]   Plaintiffs attempt to bolster these facts by sidestepping the Court's Order Striking the Second Amended Complaint and citing to Defendant-Trustee Fairshare's bylaws, but this was a theory of the case the Court directed Plaintiffs to avoid. (Doc. 76, pp. 5, 8–9). As such, the Court will not consider it now.

still failed to produce sufficient record evidence that would create a genuine issue
of fact.

### D.    Excessive Program Fees

Similarly, Plaintiffs allege Defendant-Trustee Fairshare charged excessive
Program Fees. (Doc. 105, pp. 17–22). In support, Plaintiffs again point to raw
numbers. For example, Plaintiffs point out the Program Fees have never decreased,
and, at times, the Program Fee has gone up despite a surplus balance from the
previous year. (Doc. 82-1, 132:23–133:13). Moreover, Plaintiffs contend the
excessive Program Fees are propped up by excessive payments to Wyndham-
related entities. (Doc. 105, p. 20). Again, however, the raw numbers tell the Court
nothing about when the Program Fees or payments to related entities become
excessive, and Plaintiffs provide the Court no evidence—no industry standards, no
accounting analyses, no financial calculations—to fill in this gap with regards to
*any* of the supposedly suspect payments.[12]

Finally, Plaintiffs point to the web of Wyndham-connected parties that work
with and for Defendant-Trustee Fairshare in calculating the Program budget, the
related Program Fees, and approving those projections, but this is just another
attempt to treat smoke as fire. That is, the Court will not credit the potential for
self-dealing created by WVR's role as Plan Manager as evidence of actual self-

---

[12] Perhaps to remedy this deficiency, Plaintiffs recycle their stricken theory that Defendant-
Trustee Fairshare does not conduct sufficient due diligence in setting the Program's budgets.
(Doc. 76, pp. 5–6). Once again, the Court will not countenance this attempt to circumvent its
past Order.

dealing when this role (and thus the job of calculating the Program Fees) was expressly set out in the terms of the Trust Agreement.

## IV. CONCLUSION

Accordingly, it is **ORDERED** and **ADJUDGED** that:

1.  The Motion (Doc. 94) is **GRANTED**.

2.  As a result, Plaintiffs' Motion to Strike Expert Report (Doc. 93), Defendants' Motion for Sanctions[13] (Doc. 127), and Defendant's Motion to Modify the Case Management Scheduling Order (Doc. 133) are **DENIED AS MOOT**.

3.  The Clerk of Court is **DIRECTED** to close the file.

**DONE AND ORDERED** in Orlando, Florida on March 10, 2022.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

---

[13] Magistrate Judge Embry Kidd's Report and Recommendation (Doc. 135) regarding Defendants' Motion for Sanctions (Doc. 127) did not recommend imposing monetary sanctions on Plaintiffs. To the extent that the instant Order does not moot the request for monetary sanctions, the Court agrees with Magistrate Judge Kidd's implicit finding that such a sanction is unwarranted and is otherwise denied.